# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD HACKERMAN,                  :       CIVIL NO: 1:13-CV-02883
                                    :
       Plaintiff,              :
                                    :
    v.                      :       (Magistrate Judge Schwab)
                                    :
DONALD DEMEZA AND                   :
TOLEDO RACING STABLES, LLC,         :
                                    :
       Defendants.             :

## MEMORANDUM
March 31, 2016

## I. Introduction.

Presently before the Court are the parties' cross-motions for summary judgment. The motions, having been fully briefed by the parties, are ripe for disposition. For the reasons that follow, the Plaintiff's motion (*doc. 85*) will be granted, and the Defendants' motion (*doc. 73*) will be denied.

## II. Background.

The plaintiff is Richard Hackerman ("Hackerman"), a citizen of Maryland, and the defendants are (1) Donald Demeza ("Demeza"), a citizen of Pennsylvania, and (2) Toledo Racing Stables, LLC (the "Stable"), a limited liability company in Pennsylvania, (collectively, the "Defendants"). *Doc. 33* at ¶¶ 1-3. The Stable,

which is owned and operated by Demeza, provides boarding for thoroughbred racing horses and thoroughbred broodmares. *Id.* at ¶¶ 3, 5. Hackerman brought suit against the Defendants, by filing a complaint (*doc. 1*) on November 26, 2013, followed by an amended complaint (*doc. 33*) on August 26, 2014. In his amended complaint, Hackerman sets forth the following factual allegations.

In 2011, Hackerman contacted Demeza about boarding his broodmare, Miss Savannah Rose (who was in foal), at the Stable. *Id.* at ¶ 8. Hackerman signed and emailed a document (presumably to Demeza) titled, "Boarding Agreement and Liability Release." *Id.* at ¶ 9. Separate from this agreement, however, Demeza also agreed to make sure that Miss Savannah Rose safely delivered her foal. *Id.* at ¶ 10. Hackerman then transported Miss Savannah Rose to the Stable, where her foal was eventually born. *Id.* at ¶¶ 11-12. Demeza sent Hackerman a bill for the foaling, which Hackerman paid, *id.* at ¶ 12, and shortly thereafter, Miss Savannah Rose was transported to Kentucky to be bred to U.S. Ranger. *Id.* at ¶ 13. Once she was in foal again, she was returned to the Stable. *Id.*

In February of 2012, Hackerman went to the Stable to visit Miss Savannah Rose. *Id.* at ¶ 14. During his visit, Hackerman noticed that Miss Savannah Rose "looked rather large," so he contacted Demeza, explaining the same. *Id.* Demeza, however, reassured Hackerman that he saw Miss Savannah Rose "every day" and

that she was "fine." *Id.* at ¶ 15. Demeza further reassured Hackerman that he had a camera in her stall and a TV in his bedroom so he could observe her. *Id.*

Roughly one week before the foal was born, Hackerman alleges that he called Demeza and requested that "the veterinarian" check on Miss Savannah Rose. *Id.* at ¶ 16. Demeza not only "assured [Hackerman] that this would be done," but he further assured Hackerman that Miss Savannah Rose was "fine." *Id.*

Then, on May 8, 2012, Demeza called Hackerman, informing him that Miss Savannah Rose "had foaled," but "that both [she] and her foal 'were down.'" *Id.* at ¶ 17. Hackerman drove from Baltimore to the Stable, only to find Miss Savannah Rose and her foal trying to get up, but unable. *Id.* at ¶ 18. Once "the veterinarian" arrived, the veterinarian opined that the foal needed to be taken to the hospital right away. *Id.* at ¶ 19. The foal was then transported to the University of Pennsylvania New Bolton Center, where she was euthanized for humane reasons. *Id.* at 20. Miss Savannah Rose also needed to be taken to the hospital, and she was transported to the Virginia Tech Marion DuPont Scott Equine Medical Center, where she, like her foal, was euthanized for humane reasons. *Id.* at ¶ 22. According to the amended complaint, the foal was "essentially torn in half internally," *id.* at ¶ 21, and Miss Savannah Rose "suffered catastrophic injuries including damage to her obturator nerve causing paralysis." *Id.* at ¶ 23.

Per Hackerman, the injuries and deaths of Miss Savannah Rose and her foal were a result of the "*grossly negligent*" conduct of the Defendants. *Id.* at ¶ 30 (emphasis added). More specifically, Hackerman alleges that the Defendants had a duty to provide proper care for Miss Savannah Rose, and to ensure the safe delivery of her foal, but the Defendants breached that duty in the following ways: (1) "Demeza was not at the Stable during the time Miss Savannah Rose went into labor and that for several weeks prior, [Demeza] had been leaving the Stable each day to train race horses at a race track facility over an hour and a half away;" (2) "[T]wo other broodmares in [the] Defendants' care had died just two weeks prior;" (3) "[Demeza] had not called the veterinarian to come out to check on Miss Savannah Rose as [Demeza] had promised;" (4) "Demeza had no one at the Stable who had any knowledge about the proper manner to deliver a foal, much less deliver a foal if there were emergency circumstances;" (5) a friend and relative of Demeza "delivered the foal while [Demeza] gave instructions to them over a cell phone;" and (6) "a leverage type of device was used to pull the foal from the mare which . . . should never be used in the hands of someone without proper training due to the tremendous force exerted[, which] can cause severe, traumatic and lethal injuries such as [those] suffered by Miss Savannah Rose and her foal." *Id.* at ¶¶ 24-29. As a result of the Defendants' breach, Hackerman incurred damages in

the form of veterinary bills, the value of Miss Savannah Rose, the value of her foal, and the loss of future income.   *Id.* at ¶¶ 30-31.[1]

In response to Hackerman's complaint, the Defendants, on March 10, 2014, filed an answer, as well as a counter-claim.   *Doc. 12*.[2]   Hackerman, on March 26, 2014, filed his answer (*doc. 14*) to the Defendants' counter-claim.   Since then, the Defendants have moved (*doc. 73*) for summary judgment, arguing that they are entitled to judgment as a matter of law because: (1) the "Boarding Agreement and Liability Release" specifically releases the Defendants from liability; and in the alternative, (2) Hackerman cannot prove gross negligence on the part of the Defendants.   *Doc. 75*.   Hackerman has opposed the Defendants' motion for summary judgment, but, at the Court's directive (*see doc. 79*), has only addressed the issue of whether the Defendants are released from liability pursuant to the

---

[1] Although Hackerman makes references to a "separate" (*doc*. 33 at ¶ 10), "verbal" (*doc. 88* at 8) agreement, this reference has not been fully set forth in his amended complaint, nor has it been fully articulated or argued in his briefing.   Thus, we need not address this alleged agreement.

[2] Although the Defendants filed an answer, along with a counterclaim, in response to the complaint, the Defendants did not file an answer to the amended complaint. Hackerman mentions this in his brief (*doc. 87)* in support of his motion for summary judgment, as well as in his brief (*doc. 88*) in opposition to the Defendants' motion for summary judgment, but does not ask the Court to take any action based on this fact.

"Boarding Agreement and Liability Release."[3]  *See doc. 88*.  Hackerman has also

moved (*doc. 85*) for summary judgment, arguing that he is entitled to judgment as

a matter of law because: (1) the "Boarding Agreement and Liability Release" is

ambiguous and should be strictly construed against the Defendants, the parties

seeking immunity from the "Liability Release;" and (2) the "Liability Release" is

void for reasons of public policy.  *Doc. 87.*

To the extent that the "Liability Release" sought to absolve the Defendants

of liability for their grossly negligent conduct, the "Liability Release" is invalid as

a matter of public policy.  It is on this basis that we will grant Hackerman's motion

for summary judgment, and we will deny the Defendants' motion for summary

judgment.

## III. Summary Judgment.

Hackerman and the Defendants have filed their respective motions for

summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure,

which provides that "[t]he court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary

adjudication the court may dispose of those claims that do not present a 'genuine

---

[3] Essentially, we have bifurcated the Defendants' motion for summary judgment, and therefore, we will only be addressing the parties' arguments as they relate to the issue of whether the release provision does in fact release the Defendants from liability for gross negligence.  *See doc. 79.*

dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.   Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether

there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Further, a party that moves for summary judgment on an issue for which he bears the ultimate burden of proof faces a difficult road. *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011). "[I]t is inappropriate to grant summary

judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. Se. Pa. Transp. Auth.,* 479 F.3d 232, 238 (3d Cir. 2007) (footnote omitted).   A party who has the burden of proof must persuade the factfinder that his propositions of fact are true, and "if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted." *Id.*   "Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will." *Id.*

## IV. Discussion.

### A. Cause of Action.

After listing 29 factual averments in his amended complaint, Hackerman simply states in paragraph 30 that "[t]he conduct of Defendants . . . was *grossly negligent* resulting in the deaths of Miss Savannah Rose and her foal." *Doc. 33* at ¶ 30 (emphasis added).   Yet, in both his brief (*doc. 88*) in opposition to the Defendants' motion for summary judgment and brief (*doc. 87*) in support of his own motion for summary judgment, Hackerman states that although the averments in his amended complaint "are not cast into separate counts," he has nevertheless pled enough facts to support a "breach of bailment and negligence" cause of

action. *Doc. 87* at 21; *doc. 88* at 21. Not only are Hackerman's dismal efforts to readily identify the cause of action he commenced in this Court duly noted, but as correctly pointed out by the Defendants, there is no separate cause of action for gross negligence in Pennsylvania. *Doc. 75* at 6-7; *see Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 215 n.2 (3d Cir. 2010). That being said, however, it does appear that Pennsylvania common law recognizes gross negligence as a viable theory or standard of care encompassed in a general negligence claim. *See Daly v. New Century Trans, Inc.*, No. 1:11-CV-2037, 2012 WL 4060687, at *3-4 (M.D. Pa. 2012); *Great N. Ins. Co. v. ADT Sec. Servs., Inc.*, 517 F. Supp. 2d 723, 753 n.30 (W.D. Pa. 2007); *In re Scheidmantel*, 868 A.2d 464, 484-85 (Pa. Super. 2005); *Royal Indem. Co. v. Sec. Guards, Inc.*, 255 F. Supp. 2d 497, 505-07 (E.D. Pa. 2003); *Ratti v. Wheeling Pittsburgh Steel Corporation*, 758 A.2d 695, 703-04 (Pa. Super. 2000); *Home Indem. Co. v. Nat'l Guardian Sec. Servs*. Corp., No. 94-4964, 1995 WL 298233, at *4 (E.D. Pa. 1995). Thus, we will not dismiss this entire action, as the Defendants suggest, simply because Hackerman has alleged that the conduct of the Defendants was "grossly negligent." *Doc. 33* at ¶ 30. Instead, we will allow Hackerman to proceed with his negligence cause of action while retaining his factual allegations that the Defendants' conduct was grossly negligent. *Cf. Watts v. Hollock*, No. 3:10CV92, 2011 WL 6003922, at *3 (M.D. Pa. 2011) ("Irrespective of the requite standard of care necessary to succeed at

trial, claims asserting a breach of a reckless standard and claims asserting a breach of a negligence standard both allege the tort of negligence.") (citing *Archibald v. Kemble*, 971 A.2d 513, 519 (Pa. Super. 2009)). We do not, however, treat Hackerman's cause of action as one for bailment, as Hackerman fails to develop it whole heartedly.

**B. The Release Does Not Absolve the Defendants of Liability for Gross Negligence.**

In this diversity action, it is undisputed that the parties entered into a written agreement titled, the "Boarding Agreement and Liability Release." *See doc. 74* at ¶¶ 3, 16; *doc. 83* at ¶¶ 3, 16.   It is further undisputed, *see doc. 74* at ¶ 4; *doc. 83* at ¶ 4, that the following language is contained within that written agreement:

> **RELEASE OF LIABILITY:** IN CONSIDERATION OF TOLEDO RACING STABLE UNDERTAKING THE BOARD AND OTHER RELATED SERVICES SET FORTH HEREIN, I, THE UNDERSIGNED OWNER, DO AGREE TO HOLD HARMLESS AND RELEASE TOLEDO RACING STABLE, OWNERS, AGENTS, EMPLOYEES, MEMBERS, AFFILIATED ORGANIZATIONS, INSURERS AND OTHERS ACTING ON TOLEDO RACING STABLE'S BEHALF OF ALL CLAIMS, DEMANDS, CAUSES OF ACTION, AND LEGAL LIABILITY, WHETHER THE SAME BE KNOWN OR UNKNOWN, ANTICIPATED, OR UNANTICPATED.[4]

*Doc. 12-1.* Thus, it is based upon this language (the "Release") that we must determine the bifurcated issue before us—whether the Release, which Hackerman

---

[4] The formatting of the font has been changed for purposes of this Memorandum. The text, however, remains unchanged.

signed before he suffered any injury, absolves the Defendants of liability for grossly negligent conduct.

Considering that we are sitting in diversity, we note from the outset that the substantive law of Pennsylvania applies to this action. *See Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).  In that regard, we believe that a brief dissertation of *Tayar v. Camelback Ski Corp.*, 47 A.3d 1190 (2012), the Supreme Court of Pennsylvania's most recent analysis of pre-injury releases, will helpful to our discussion as the issues raised in *Tayar* are parallel to the ones before us today.

### 1. *Tayar v. Camelback Ski Corp.*

In *Tayar*, the appellant, Camelback Ski Corporation, Inc. ("Camelback"), was an operator of a ski resort in Pennsylvania, offering various winter activities, including skiing and snow tubing, to its patrons. *Id.* at 1192.  Before allowing its patrons to snow tube, however, Camelback required each patron to sign a pre-printed release form, which included, in pertinent part, the following language:

> IN CONSIDERATION OF THE ABOVE AND OF BEING ALLOWED TO PARTICIPATE IN THE SPORT OF SNOWTUBING, I AGREE THAT I WILL NOT SUE AND WILL RELEASE FROM ANY AND ALL LIABILITY CAMELBACK SKI CORPORATION IF I OR ANY MEMBER OF MY FAMILY IS INJURED WHILE USING ANY OF THE SNOWTUBING FACILITIES OR WHILE BEING PRESENT AT THE FACILITIES, EVEN IF I CONTEND THAT SUCH INJURIES ARE THE RESULT OF NEGLIGENCE OR ANY

13

OTHER IMPROPER CONDUCT ON THE PART OF THE SNOWTUBING FACILITY.

*Id.* at 1192-93.   One of its patrons, the appellee in *Tayar*, Barbara Lichtman Tayar ("Tayar"), signed the foregoing release and elected to use the "family" tubing slopes at Camelback.  *Id.* at 1193.  These family slopes were not only separated from the other tubing slopes, but they were controlled by a Camelback employee, who would discharge the snow tubers from the top of the slope once the prior snow tubers had reached and cleared the "receiving area" at the bottom of the slope.  *Id.* This receiving area was also separated from the common receiving area of the other slopes.  *Id.*

After having four successful runs down the family slopes, Tayar, on her fifth run, reached the receiving area at the bottom of the slope, exited her tube, and was immediately struck by another snow tuber coming down the same slope.  *Id.* As a result, she suffered multiple fractures of her right leg and underwent surgery, which required two metal plates and 14 screws.  *Id.* Eventually, Tayar brought an action against Camelback and the employee who discharged the other snow tuber. *Id.*

Initially, the Pennsylvania Court of Common Pleas granted Camelback and its employee's motion for summary judgment as to Tayar's claims, finding them to be barred by the foregoing release that Tayar signed prior to snow tubing.  *Id.* at 1193-94.  A three-judge panel affirmed in a divided decision, but later, the

14

Superior Court of Pennsylvania granted Tayar's request to rehear the matter *en banc*. *Id.* at 1194. The *en banc* Superior Court ultimately reversed the Court of Common Pleas, determining that while the release was valid, it was only valid with respect to Camelback, the snow tubing facility, and therefore, a material question remained as to whether the employee acted recklessly or negligently. *Id.* Camelback and its employee, petitioned the Pennsylvania Supreme Court for review, which the Supreme Court granted with respect to the following three issues: "(1) whether employees are encompassed by a release which only mentions the employer; (2) whether public policy permits releases of reckless behavior; and if so, (3) the language necessary to achieve such a release." *Id.* at 1194-95.

With regard to whether employees are encompassed by a release which only mentions the employer, the *Tayar* Court readily concluded that the release before it encompassed the conduct of both: (1) the employer (Camelback); and (2) its employees, including the employee that released the snow tuber, who ultimately crashed into Tayar. *Id.* at 1196-97. As explained by the Supreme Court, Tayar failed to point to any "express indication" that Camelback's employees were actually removed from the protection of the release. *Id.* at 1196. As further explained by the Supreme Court, because the release referred to "Camelback Ski Corporation" and "the snow tubing facility," the release "expressed with sufficient particularity that it covered the acts of Camelback employees, as Camelback could

not act, negligently, improperly, or otherwise, other than through its agents and employees." *Id.* Thus, the Pennsylvania Supreme Court concluded that the release encompassed the acts of both Camelback and its employees. *Id.* at 1196-97.

In considering whether public policy permits releases of reckless behavior, the Pennsylvania Supreme Court first considered where on the spectrum of tortious conduct recklessness falls. *Id.* at 1200. As explained by the Supreme Court, there are, at one end of that spectrum, exculpatory clauses which release a party from negligence. *Id.* Generally, these clauses are not against public policy. *Id.* At the other end of the spectrum, however, there are exculpatory clauses which release a party from intentional conduct. *Id.* Generally, these clauses are against public policy. *Id.* The Supreme Court then used these materially distinct concepts of negligent conduct and intentional conduct to ascertain where reckless conduct would fall on the spectrum. *Id.* The Supreme Court explained that "[r]ecklessness is distinguishable from negligence on the basis that recklessness requires conscious action or inaction which creates a substantial risk of harm to others, whereas negligence suggests unconscious inadvertence." *Id.* at 1200; *see* AMJUR Negligence § 274 ("Recklessness is more than ordinary negligence and more than want of ordinary care; it is an extreme departure from ordinary care, a wanton or heedless indifference to consequences, an indifference whether or not wrong is done, and an indifference to the rights of others."). The Court further explained

that "[t]his conceptualization of recklessness as requiring *conscious* action or inaction not only distinguishes recklessness from ordinary negligence, but aligns it more closely with intentional conduct." *Tayar*, 47 A.3d at 1201 (emphasis in original). Thus, and unsurprisingly, the Pennsylvania Supreme Court applied the same prohibition on releasing reckless conduct as it does on releasing intentional conduct. *Id.* at 1201-02. As explained by the Supreme Court, it would not sanction releases for reckless conduct, since parties would essentially be "escap[ing] liability for consciously disregarding substantial risks of harm to others[.]" *Id.* at 1203. The Supreme Court further explained that such releases are invalid because they "jeopardize the health, safety, and welfare of the people by removing any incentive for parties to adhere to minimal standards of safe conduct." *Id.* As such, the Supreme Court concluded that "even in [the] voluntarily recreational setting involving private parties, there is a dominant public policy against allowing exculpatory releases of reckless behavior[.]" *Id.*

### 2. The Release Encompasses the Conduct of Both Defendants.

Here, in accordance with *Tayar*, we first determine whether the instant Release encompasses the conduct of both the Stable and Demeza. Although Hackerman has not argued that the release only encompasses the conduct of the Stable, we nevertheless conclude, as preliminary matter, that the Release encompasses the conduct of both Defendants. Certainly, "a corporation can only

act through its officers, agents, and employees," *id.* at 1196, and as set forth in the Release itself, Hackerman agreed not only to release the Stable, but also the Stable's "owners, agents, employees, members, affiliated organizations, insurers, and others acting on [its] behalf[.]" *Doc. 12-1* at 2.  Thus, we conclude that the Release expressly encompasses the conduct of both Defendants in this action.  *See Tayar*, 47 A.3d at 1196 (finding that the release "expressed with sufficient particularity" that it covered the acts of Camelback employees, as Camelback could not act . . . other than through its agents and employees").

### 3. The Release is Invalid Against a Claim of Gross Negligence as a Result of Public Policy.

In accordance with *Tayar*, we next determine whether it is against public policy for a pre-injury release to relieve a party of liability for grossly negligent conduct.  *See Tayar*, 47 A.3d at 1197.  Per the Pennsylvania Supreme Court, a release is valid when the following three conditions are met: (1) "the clause must not contravene public policy;" (2) "the contract must be between persons relating entirely to their own private affairs[;]" and (3) "each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion." *Topp Copy Products, Inc. v. Singletary*, 626 A.2d 98, 99 (1993); *see id.* (explaining that even if these initial conditions are met, and the release is therefore "valid," the release will "still be unenforceable unless the language of the parties is clear that a person is being relieved of liability for his own acts of negligence").

18

Here, the Defendants have not addressed whether these initial conditions, which make a release provision valid, have been satisfied.  *See doc. 75*.  Instead, the Defendants have skipped to whether the release is nevertheless enforceable, arguing that the Release *is* enforceable because the terms are clear and unambiguous.  *Id.* at 2-6.  Hackerman, however, has addressed the first of these initial conditions, arguing that the release is invalid as a matter of public policy. *Doc. 87* at 21-29.  Because neither party contests the other two conditions—i.e., whether the contract is between persons concerning their private affairs and whether each party is a free bargaining agent so the contract is not one of adhesion, *see Topp Copy*, 626 A.2d at 99—our focus is only on the first of these initial conditions.  Accordingly, we must determine whether a pre-injury release, which releases "all" conduct, contravenes public policy when a party uses such a release to absolve himself of liability for his grossly negligent conduct. This issue, although similar to the one presented in *Tayar*,[5] appears to be one that the Pennsylvania Supreme Court has not squarely addressed.  Thus, we are tasked with "predict[ing] what the Pennsylvania Supreme Court would do if presented with this case."  *2-J Corp. v. Tice*, 126 F.3d 539, 541 (3d Cir. 1997).  And, in predicting, "we must consider relevant state precedents, analogous decisions, considered dicta,

---

[5] To recall, the Pennsylvania Supreme Court, in *Tayar*, addressed whether reckless conduct can be released in a pre-injury release.  *Tayar*, 47 A.3d at 1197.

scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Id.* (quoting *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 117 (3d Cir. 1987)).

We note from the outset that although parties may generally "contract as they wish . . . freedom of contract is not absolute." *Cent. Dauphin Sch. Dist. v. Am. Cas. Co.*, 426 A.2d 94, 96 (1981) (quoting Restatement (Second) of Contracts Ch. 14 (Unenforceability on Grounds of Public Policy) Introductory Note, p. 46 (Tent.Draft No. 12, March 1, 1977)) (internal quotation marks omitted). Indeed, terms of an agreement, including those of a release provision, may be deemed unenforceable as a result of being contrary to public policy. *Id.* (citations omitted). And, terms of an agreement are contrary to public policy when they "tend to injure the public[,]" are "against the public good," or are "inconsistent with good morals[.]" *Public J.F. v. D.B.*, 897 A.2d 1261, 1279 (2006). That being said, however, public policy is more than just some "vague goal;" it is determined by referencing "legal precedents, governmental practice, or obvious ethical or moral standards." *Tayar*, 47 A.3d. at 1199. As observed by the Pennsylvania Supreme Court:

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy[.] . . . Only dominant public policy would justify such action. In the

> absence of a plain indication of that policy through long
> governmental practice or statutory enactments, or of violations of
> obvious ethical or moral standards, the Court should not assume
> to declare contracts . . . contrary to public policy. The courts
> must be content to await legislative action.

*Tayar*, 47 A.3d at 1199 (quoting *Williams v. GEICO Gov't Employees Ins. Co.*, 32 A.3d 1195 (2011)) (internal quotation marks omitted; alterations in original); *accord Burstein v. Prudential Prop. & Cas. Ins. Co.*, 809 A.2d 204, 207 (2002).

"In ruminating on this question, we first consider where on the spectrum of tortious conduct [gross negligence] falls." *See Tayar*, 47 A.3d at 1200. As explained by the Pennsylvania Supreme Court, there are at one end of that spectrum exculpatory clauses which release a party from negligence. *Id.* Generally, these clauses are not against public policy. *Id.* At the other end of the spectrum, however, there are exculpatory clauses which release a party from intentional conduct. *Id.* Generally, these clauses are against public policy. *Id.*

Despite the *Tayar* Court's assessment of the various categories of negligent, reckless, and intentional conduct, as well as where these categories of conduct fall on the spectrum of tortious conduct, the Court did not address grossly negligent conduct, nor did it address where grossly negligent conduct would fall on the spectrum. Instead, the Court saved this consideration, among other considerations, for "another day." *See id.* at 1199 n.7. Unfortunately, the task of defining grossly negligent conduct has posed a longstanding problem for Pennsylvania courts.

*Scheidmantel*, 868 A.2d at 484; *see Royal Indem. Co.*, 255 F. Supp. 2d at 505 ("There are many decisions of the Pennsylvania and federal courts applying Pennsylvania law and which discuss the concept of gross negligence. Analyzing the holdings and the language of the numerous Pennsylvania cases on this issue is more similar to looking at multiple pellets from a shotgun as compared to a single bullet from a rifle."). Thus, despite the fact that the term "gross negligence" has been frequently employed since the early days of the Commonwealth, this term "has not been well defined in the civil context." *Scheidmantel*, 868 A.2d. at 484 (collecting Pennsylvania cases); *Bloom v. Dubois Reg'l Med. Ctr.*, 597 A.2d 671, 679-80 (1991) (collecting Pennsylvania cases). And, "[i]n many instances, courts appear to have been willing to proceed in the absence of any definition whatsoever." *Scheidmantel*, 868 A.2d. at 485. Nevertheless, it does appear that there is a "general consensus" which finds grossly negligent conduct to be more egregious than negligent conduct, but less egregious then intentional conduct. *Ratti*, 758 A.2d at 703. Beyond this general consensus, however, there does not appear to be "a workable definition" that truly outlines the contours of gross negligence in Pennsylvania.[6] *Scheidmantel*, 868 A.2d. at 485.

---

[6] Apparently, however, Pennsylvania is not only the state that has had difficulty defining this nebulous term. *See* Olga Voinarevich, *An Overview of the Grossly Inconsistent Definitions of "Gross Negligence" in American Jurisprudence*, 48 J. MARSHALL L. REV. 471, 472, 481 (2015) (observing that courts in many jurisdictions "continue to battle with the proper meaning of [gross negligence]"

For that reason, we look to the Restatement (Second) of Torts (1965), which was heavily relied on by the Pennsylvania Supreme Court in *Tayar* when defining recklessness and in contrasting the concept of recklessness with the concept of negligence.  *See Tayar*, 47 A.3d at 1200-02.  The Supreme Court, quoting the Restatement (Second) of Torts, set forth the following definition for recklessness:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Id.* at 1200-01 (quoting Restatement (Second) of Torts § 500 (1965)).  Because the Pennsylvania Supreme Court relied heavily on the Restatement for its definition of reckless conduct, and because Pennsylvania jurisprudence has not clearly defined grossly negligent conduct, we gleaned the Restatement for a definition of "gross negligence."  Interestingly, however, while the Index does identify the term, "gross negligence," it nevertheless states the following: "GENERALLY, SEE RECKLESSNESS."[7]  Restatement (Second) of Torts, Index, (1965)).  Thus, per the Restatement, gross negligence is a synonym for recklessness.  Because they

---

and further observing that "[w]hen one attempts to define [this term] the concept shatters into a kaleidoscopic disarray of terms, elements, and subtle graduations of meaning," making it a "legal tower of Babel, where many voices are heard, but few are generally understood") (quoted source omitted).

[7] The formatting of the font has been changed for purposes of this Memorandum.

are synonyms, we can presume, at least for purposes of interpreting the Restatement, that the meaning of these terms is virtually the same. Regardless of this fact, we still look to the commentary of the Restatement for further guidance.

In particular, the commentary to § 500 provides that "[r]recklessness may consist of either of two different types of conduct." Restatement (Second) of Torts § 500 cmt. a (1965). Under the one type of reckless conduct, "the actor knows, or has reason to know . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." *Id.* Under the other type of reckless conduct, the actor knows, or has reason to know, of the facts, "but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so." *Id.* A subjective standard is applied to the former type of reckless conduct, and an objective standard is applied to the latter type of reckless conduct. *See id.* Regardless of the type of reckless conduct, recklessness generally "requires a *conscious* choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." Restatement (Second) of Torts § 500 cmt. g (1965) (emphasis added).

It is our observation that the Pennsylvania Supreme Court, in *Tayar*, primarily focused on the former type of recklessness, which requires that the actor

24

deliberately acts or fails to act, despite knowing of the serious danger involved. *See Tayar*, 47 A.3d at 1200-02. And, it is our conclusion that the latter type of recklessness is a more precise definition of gross negligence. Specifically, gross negligence requires that, although the actor may not recognize that his conduct involves an unjustifiable risk of harm, the actor nevertheless knows or has reason to know of facts which would lead any reasonable man to recognize not only that his conduct does create an unjustifiable risk of harm, but also, that such risk of harm is substantially greater than that which is necessary to make his conduct negligent. Restatement (Second) of Torts § 500 cmt. a (1965). Thus, gross negligence, like recklessness, requires "a *conscious* choice of a course of action," coupled with the knowledge of facts, or reason to know of such facts, which would disclose to any reasonable man that his conduct involves an unjustifiable risk of harm. Restatement (Second) of Torts § 500 cmt. g (1965) (emphasis added). This proposed definition of gross negligence is further supported by the commentary of the Restatement, which provides as follows:

> In order that the actor's conduct may be reckless, it is not necessary that *he himself* recognize it as being extremely dangerous. His inability to realize the danger may be due to *his own reckless temperament*, or to the abnormally favorable results of previous conduct of the same sort. It is enough that he knows or has reason to know of circumstances which would bring home to the realization of the ordinary, reasonable man the highly dangerous character of his conduct.

Restatement (Second) of Torts § 500 cmt. c (1965) (emphasis added).

Considering, however, the current state of "gross negligence" in Pennsylvania jurisprudence, we recognize that it may be optimistic for any federal court to set forth the "proper" definition of gross negligence in Pennsylvania. Thus, regardless of whatever that proper definition may be, it is a definition which will likely align itself more closely with recklessness than with mere negligence. *See* Restatement (Second) of Torts § 500 cmt. g (1965) (explaining that negligence consists of "mere inadvertence, incompetence, unskillfulness, or a failure to take precaution[,] whereas reckless conduct "involves a risk substantially greater in amount than that which is necessary to make his conduct negligent"); *see also Fid. Leasing Corp. v. Dun & Bradstreet, Inc.*, 494 F. Supp. 786, 790 n.5 (E.D. Pa. 1980) ("Theoretical lines of distinction between *gross negligence* and . . . *reckless* behavior are rarely drawn sharply, if drawn at all."); *see also Royal Indem. Co.*, 255 F. Supp. 2d at 505 (explaining that gross negligence, under Pennsylvania law, has also been defined as a "failure to perform a duty in *reckless disregard* of the consequences . . . ") (emphasis added).   Because gross negligence aligns itself more closely with recklessness, we predict that the Pennsylvania Supreme will be inclined to apply the same prohibition on releasing grossly negligent conduct, as it does on releasing reckless conduct.  *See Tayar*, 47 A.3d at 1201.  Our prediction, however, is premised on more than just trying to achieve a "vague goal." *Id.* at 1199.   Instead, our prediction is determined by reference to legal precedent,

decisions from sister states and federal courts, statutory analysis, and persuasive authority from legal treatises.

We begin by referencing *Tayar*, which as previously stated, is the Pennsylvania Supreme Court's most recent analysis of pre-injury releases. In *Tayar*, the Supreme Court expressed criticism of *Valeo*, a Pennsylvania Superior Court case, where the plaintiff signed a release that essentially relieved the defendant "from all liability[.]" *Valeo v. Pocono Int'l Raceway, Inc.*, 500 A.2d 492, 492-93 (Pa Super. 1985). In *Valeo*, the Pennsylvania Superior Court disagreed with the plaintiff's contention that the release did not include his claim of gross negligence, finding that the "language of the exculpatory clause was broad enough to exclude liability for all degrees of negligence." *Id.* at 493. The *Tayar* Court not only criticized the *Valeo* Court for not citing any authority to support its proposition, but the *Tayar* Court further criticized the *Valeo* Court for not addressing the critical public policy concerns of permitting such a release. *Tayar*, 47 A.3d at 1199 n.7. Thus, it is our view that the *Tayar* Court's criticism of *Valeo* seemingly suggests that a pre-injury release, which releases grossly negligent conduct, does raise public policy considerations. This view tracks with older precedent from the Pennsylvania Supreme Court, dating back to 1854 and holding that broadly worded pre-injury exculpatory releases, which attempt to release a party from his grossly negligent conduct, are unenforceable. *See Pennsylvania*

*R.R. Co. v. McCloskey's Adm'rs*, 23 Pa. 526, 532 (1854); *Pennsylvania R. Co. v. Henderson*, 51 Pa. 315, 331 (1866).   This view also tracks with more recent precedent from the Pennsylvania  Superior Court.  *See Ratti*, 758 A.2d at 705; *see generally Gares v. Willingboro Township*, 90 F.3d 720, 725 (3d Cir. 1996) ("In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule.").

Additionally, decisions of our sister states also lend support to our conclusion that there is public policy against sanctioning pre-injury release provisions, which release grossly negligent behavior.  *See Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 747-48 (Conn. 2005) (collecting cases from other states, including Oregon, Hawaii, Georgia, Massachusetts, Oklahoma, Tennessee, Washington, Nebraska, Maryland) ("[W]e find it significant that many states uphold exculpatory agreements in the context of *simple* negligence, but refuse to enforce such agreements in the context of *gross* negligence.") (emphasis in original); *see also Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 922, 924 (Tex. App. 2013) (explaining that Texas has a strong public policy against releases of liability for one's own gross negligence, as such conduct "poses an extreme risk of harm to others" and involves "heightened concerns for public welfare"); *New Light Co. v. Wells Fargo Alarm Servs., Div. of Baker Protective Servs., Inc.*, 525

N.W.2d 25, 31 (Neb. Ct. App. 1994) ("Even if the exculpatory clause could be construed to include gross negligence and willful and wanton misconduct, public policy prohibits such an exclusion."); *Heiman v. Mayfield*, 686 S.E.2d 284, 287 (Ga. Ct. App. 2009) ("Exculpatory clauses in which a business relieves itself from its own negligence are valid and binding in this State and are not void as against public policy unless they purport to relieve liability for acts of gross negligence or wilful or wanton conduct."); *Shelby Mut. Ins. Co. v. City of Grand Rapids*, 148 N.W.2d 260, 262 (Mich. Ct. App. 1967) ("[T]he general rule appears to be that a party may contract against liability for harm caused by his negligence in performance of a contractual duty[;] he may not do so with respect to his gross negligence."); *Stelluti v. Casapenn Enterprises, LLC*, 975 A.2d 494, 508 (N.J. Super. Ct. App. Div. 2009) (refusing to immunize a party from its own wrongs that rise to a degree of fault beyond mere negligence); *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 24 (Md. 2013) ("[A] party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross.") (quoted case omitted); *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983) ("But an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly  negligent acts[.]");

29

*Butler Mfg. Co. v. Americold Corp.*, 835 F. Supp. 1274, 1283 (D. Kan. 1993) ("Kansas law prohibits the enforcement of liability limitation provisions limiting damages for gross negligence and willful or wanton conduct."); *City of Santa Barbara v. Superior Court*, 161 P.3d 1095, 1115 (Cal. 2007) ("[W]e conclude that public policy generally precludes enforcement of an agreement that would remove an obligation to adhere to even a *minimal* standard of care.") (emphasis in original); *Matter of Pac. Adventures, Inc.*, 5 F. Supp. 2d 874, 881-82 (D. Haw. 1998) ("Hawaii law permits release from liability for ordinary  negligence, but "[t]he public interest is at stake when a party attempts to contract to exempt himself for harm caused by his gross negligence.") (quoted case omitted).  And, in fact, one of our sister states, which was required to determine whether an exculpatory agreement released the defendants from grossly negligent conduct while those defendants were boarding and training the plaintiff's horse, ultimately found that the parties' agreement did not bar the plaintiff's claim for gross negligence since a party cannot contract away his liability for such conduct. *Thrasher v. Riverbend Stables*, No. M2007-01237-COA-R3-CV, 2008 WL 2165194, at *4 (Tenn. Ct. App. 2008).[8]

---

[8] In *Thrasher*, the plaintiff's complaint arose out of the death of her horse, Lola, while Lola was being trained at Riverbend Stables, LLC ("Riverbend"). *Thrasher*, 2008 WL 2165194, at *1.  According to the plaintiff, Lola died as a result of the negligent and grossly negligent conduct of Riverbend, and its horse trainer.  *Id.* The Tennessee Court of Appeals concluded that the agreement, which plaintiff

Likewise, federal courts applying Pennsylvania law have also barred the enforcement of releases for grossly negligent behavior. *See e.g*., *Fid. Leasing Corp.*, 494 F. Supp. at 789-90 (concluding that an exculpatory clause in Pennsylvania would not insulate a defendant from liability for gross negligence or recklessness); *Mandell v. Ski Shawnee, Inc*., No. 305CV1503, 2007 WL 121847, at *4 (M.D. Pa. 2007) (finding an exculpatory agreement to be unenforceable, where the exculpatory agreement did not mention gross negligence); *Neuchatel Ins. v. ADT Sec. Sys*., Inc., No. 96–5396, 1998 WL 966080, at *7 n.4 (E.D. Pa. 1998) ("[I]f . . . an exculpatory clause . . . excludes or limits only negligent conduct and is not broad enough to cover conduct that may be described as grossly negligent, willful or wanton, liability is neither excluded nor limited if the conduct alleged is found to be grossly negligent, willful or wanton."); *Pub. Serv. Enter. Grp., Inc. v. Philadelphia Elec. Co.*, 722 F. Supp. 184, 205 (D.N.J. 1989) (explaining that an exculpatory clause in Pennsylvania would not limit a defendant's liability for grossly negligent, willful or wanton behavior).[9]

---

signed prior to boarding her horse at Riverbend, barred plaintiff's claim of general negligence, but did not bar plaintiff's claim of gross negligence. *Id.* at *5. The Court of Appeals cited to case law explaining that "an exculpatory clause in a contract 'will not operate to protect a party who is guilty of gross negligence.'" *Id.* (quoted case omitted).

[9] Although these federal cases do not discuss the public policy concerns of permitting a release which bars claims of grossly negligent conduct, these cases

Moreover, Pennsylvania's Animal Cruelty statute, 18 Pa. Stat. and Cons. Stat. Ann. § 5511 (West), which Hackerman points to in his briefs, *see docs*. *87, 88*, also lends support to our prediction.   Specifically, this statute makes it a criminal offense for a person to wantonly or cruelly treat any animal or neglect any animal as to which that person has a duty of care, whether belonging to himself or otherwise, or deprives any animal of necessary veterinary care. *Id.* The Pennsylvania Superior Court has "expressly adopt[ed] the Black's Law Dictionary definition of 'wanton' in the context of [this statute], as 'unreasonably or maliciously risking harm while being utterly indifferent to the consequences.'" *See Com. v. Shickora*, 116 A.3d 1150, 1157 (2015); *see* 18 Pa. Stat. and Cons. Stat. Ann. § 5511(e.1), (q) (West) (contemplating and defining "equine animals," which includes horses).   Thus, we find that there is legislative intent, relating to the context of this case, which supports the proposition that the Pennsylvania Supreme Court will find that a release, which bars claims of grossly negligent conduct, are against public policy.

Finally, there are leading treatises, which the Pennsylvania Supreme Court has recently cited with approval, *see Tayar*, 47 A.3d at 1200-02, that also lend support to our prediction that release provisions, which release grossly negligent conduct, are unenforceable on public policy grounds.   *See* Williston, Contracts §

were decided prior to 2012—the year in which the Pennsylvania Supreme Court rendered its ruling in *Tayar*.

19.24 (1998) ("An attempted exemption from liability for a future intentional tort or crime or for a future willful or *grossly negligent* act is generally void[.]") (emphasis added);[10] 15 Corbin on Contracts § 85.18 (2003), ("Courts do not enforce agreements to exempt parties from tort liability if the liability results from that parties' own *gross negligence*, recklessness, or intentional conduct.") (emphasis added).

Thus, although it is settled that parties are free to contract as they wish, it is also settled that contracts, which violate public policy, are unenforceable. *See Cent. Dauphin Sch. Dist.*, 426 A.2d at 96 (citations omitted); *Tayar*, 47 A.3d at 1199. Unsurprisingly, a party cannot contract away his liability for reckless or intentional conduct, as these types of conduct severely undermine the policy, which governs Pennsylvania's tort system. *See generally Tayar*, 47 A.3d at 1203 (emphasizing that the sanctioning of releases for reckless conduct permits a party to abscond the duty to adhere to even minimal standards of safe conduct).

We only supplement these longstanding principles by holding that a party cannot contract away his liability for grossly negligent conduct, as such conduct poses an extreme risk of harm to the rights, safety, and welfare of others. Indeed,

---

[10] Although there is a 2010 edition of Williston on Contracts, the Pennsylvania Supreme Court of Pennsylvania, in 2012, cited a provision from the 1998 edition. *See Tayar*, 47 A.3d. at 1202. The provision, which the Supreme Court cited, still appears in the 2010 edition.

it is difficult to imagine that Pennsylvania's strong public policy against pre-injury releases of recklessness would not apply to pre-injury releases of gross negligence. *See id.* at 1204.   Therefore, to the extent that the instant Release bars liability for grossly negligent conduct, the Release is invalid as a matter of public policy.[11]

That being said, whether the Defendants' conduct amounted to gross negligence is ultimately a question of fact to be determined by the fact-finder. *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1164–65 (1997) ("[T]he issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury[.]"); (*Stark Co. v. National Guardian Sec. Servs.*, 1990 WL 112110, *3 (E.D.Pa. Aug. 3, 1990) (concluding that "[w]hether defendant's actions demonstrate the lack of care required of gross

---

[11] As stated herein, we have allowed Hackerman to proceed with his negligence cause of action while retaining factual allegations that the Defendants' conduct was grossly negligent.  Without holding, we note, that had Hackerman not alleged "grossly negligent" conduct, and instead, had only alleged "negligent" conduct, then the instant Release would have barred Hackerman's cause of action.  *See Topp Copy*, 626 A.2d at 99-100 (concluding that an exculpatory clause absolving lessor of "any and all liability" covers negligence even though the word "negligence" does not appear in clause); *Zimmer v. Mitchell & Ness*, 385 A.2d 437, 440 (1978) (holding that exculpatory clause barred plaintiff's claim and reasoning that general language in the parties' release, which exempted the defendant from any liability, necessarily included liability from alleged negligence) *aff'd per curiam*, 416 A.2d 1010 (1980); *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1193 (2010) (holding that broadly worded exculpatory clause barred plaintiff's claims for negligence, notwithstanding plaintiff's arguments that the term "negligence" was not defined or illustrated in the release).

negligence is a question of fact for the jury"). Thus, this cause of action shall proceed to trial.

**V. Conclusion.**

For all of the foregoing reasons, Hackerman's motion (*doc. 85*) for summary judgment will be granted with respect to the issue of whether the exculpatory provision releases the Defendants from liability for grossly negligent conduct, and the Defendants' motion (*doc. 73*) will be denied. An implementing order follows.

<u>**S/Susan E. Schwab**</u>
Susan E. Schwab
United States Magistrate Judge